Jessie LAREZ, Armida Larez, Albertdee Larez, Frank Larez, Katsumi Larez, Diane Larez, and Keiko Larez, Plaintiffs–Appellees,

v.

CITY OF LOS ANGELES, Daryl Gates, Dennis Keller, William Holcomb, Dennis Fanning, John Sequist, Edward Ortiz, and Rudolph Navarro, Jr., Defendants–Appellants.

Nos. 89–55541, 89–55801.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 1991.

Decided Sept. 27, 1991.

As Amended Oct. 7, 1991.

Richard M. Helgeson, Asst. City Atty., Jeffrey Nelson, Deputy City Atty., and James K. Hahn, City Atty., Los Angeles, Cal., for defendants-appellants.

Marion R. Yagman, Stephen Yagman, Yagman & Yagman, P.C., Venice, Cal., for plaintiffs-appellees.

Before BOOCHEVER, HALL and RYMER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Six officers of the Los Angeles Police Department (LAPD), Chief of Police Daryl Gates, and the City of Los Angeles appeal from the district court's denial of their motion for a new trial after jury verdicts against them in a civil rights trial based on a search of the home of the Larez family. We affirm the denial of the new trial motion as to the six officers, but, because of

the erroneous admission of hearsay evidence, which we cannot say was harmless, we reverse and remand for a new trial as to Gates and the City.

## BACKGROUND

The civil rights action which is the subject of this appeal arises out of an LAPD search of the Larez home.[1] Because a jury found that the Larezes' constitutional rights had been violated by an unreasonable search executed through the use of excessive force, we state all the relevant facts, in the light most favorable to the plaintiffs, although some of the material facts were contradicted by the testimony of the officers. *See Hammer v. Gross*, 932 F.2d 842, 844 (9th Cir.1991) (*en banc*); *United States v. Alfonso*, 759 F.2d 728, 740 (9th Cir.1985) ("On appeal the evidence must be viewed in the light most favorable to the verdict.") (citation omitted). *See also Bordanaro v. McLeod*, 871 F.2d 1151, 1153 (1st Cir.1989) (stating facts in light most favorable to prevailing party in § 1983 action).

Less than one week prior to the search, certain LAPD officers visited the Larez home to contact Edward Larez (one of the Larez sons who is not a plaintiff in this action) regarding a suspected gang killing. His mother, Armida, told them Eddie was not home but consented to a search of the residence. When her husband, Jessie, encountered them, he told them to get out. Officers Keller and Holcomb (both defendants in this action), who had their guns drawn and pointed at Jessie, told him they had "every damn fucking right to be on [the Larez] property." As the officers were leaving the Larez home, one of them assured another, "don't worry about it[,] Holcomb will get the son of a bitch."

In the meantime, a man named Richard Jimenez confessed to the gang-related murder. Nonetheless, LAPD officers from the CRASH (Community Resources Against Street Hoodlums) division obtained a search warrant for the Larez home because

they believed that the murder weapon used by Jimenez might be found there as he and Eddie were friends. At approximately 7:00 a.m., the six officers named as defendants here, Dennis Keller, William Holcomb, Dennis Fanning, John Sequist, Edward Ortiz, and Rudolph Navarro, executed the warrant. Although they had not applied for a nighttime entry, or a no-knock warrant, both of which are utilized in cases involving potential danger, the CRASH unit conducted a "crisis entry" which involved breaking the back windows of the house to create a diversion ostensibly aimed at making a front entry safer.

Upon entering the Larez home, the officers physically and verbally mistreated members of the family. They hurled Jessie across the room, grabbed him by the hair, forced him to lie face down on the floor where one of the officers held Jessie down with his knee on Jessie's neck and handcuffed him. Police kicked him and smashed his face into the floor. The officers laughed and sneered; they told him they had him where they wanted him. At one point Officer Holcomb pointed his service revolver at Jessie's head and said to him, "I could blow your fucking head off right here and nobody can prove you did not try to do something." Officer Keller told Jessie, "we finally got you motherfucker." Jessie sustained a broken nose during the incident. His knees required arthroscopic surgery, and neck surgery was recommended to alleviate the headaches which have persisted since the incident.

Police yelled to Diane to "get up here with that fucking baby," referring to her infant. Upon approaching, she was seized by her waist-long hair and arm and thrown face first to the floor where she, too, was handcuffed. Upon lifting her head to instruct a family member to take her baby away, Officer Keller grabbed Diane's hair and banged her head to the floor, demanding she "put [her] fucking face on the floor."

---

**1.** Specifically, plaintiffs in this case were Jessie and Armida Larez and five of their children: Albertdee, Frank, Katsumi, Diane, and Keiko.

Katsumi, who was sleeping in his room attached to the garage at the time of the search, was awoken when his door was kicked in by police. An officer pointed his gun at Katsumi and shouted, "I'll blow your fucking head off." He was taken to the living room where he and his brother Frank, like Jessie and Diane, were also proned out on the floor and handcuffed. Katsumi was kicked in the head and side by Officer Holcomb.

The police left the Larez home "turned upside down." Pots, pans, and dishes had been taken from their cabinets and thrown to the floor, and various objects kept on the bar, as well as the VCR, had been thrown on the TV room floor. Katsumi's room looked as if a "hurricane [had] whipped through it." Albertdee saw beds turned over, clothing in heaps on the floor, broken crockery in the kitchen, and broken windows. His bedroom posters had been ripped from the walls, his punching bag had been cut open, and his plants had been dislodged from their pots. Jessie's prized Japanese albums, obtained while he was stationed in Japan, were broken by the defendants. Other broken items included a pitcher, a crockpot, a figurine, a dish, a vase, a music box, a lamp, a rice cooker, a coffee pot, wall paneling, a clock, a sliding glass door, picture frames, and a camera lens.

Jessie lodged a complaint with the LAPD. The department's Internal Affairs division assigned a CRASH detective not involved in the Larez search to investigate the complaint. In a letter signed by Chief Gates, Jessie ultimately was notified that none of the many allegations in his complaint could be sustained. The instant suit followed.

The Larezes' theory at trial was that the six individual officers had violated their constitutional rights to be free from unreasonable searches accompanied by the use of excessive force. Moreover, they complained about the disarray in which their home was left. Against Chief Gates and the City, the Larezes alleged the perpetuation of unconstitutional policies or customs of excessive force, illegal searches includ-ing official tolerance for the destruction of property during such searches, and inadequate citizen complaint procedures which have the effect of encouraging the excessive use of force.

Trial was bifurcated between the case against the six officers and the case against the Gates and the City. After the Larezes prevailed against the six officers, Gates and the City moved to dismiss the case against them contending that, because plaintiffs were fully awarded compensatory damages in the first phase of the trial, nothing was left to be adjudicated. The motion was denied.

At trial on the liability of Gates and the City, the Larezes called as an expert, Dr. James J. Fyfe, the Chairman of and a Professor in the Department of Justice, Law, and Society at American University. Fyfe was formerly a New York City police officer, and was qualified as an expert on proper police procedures and policies. Fyfe criticized the manner in which LAPD investigated Jessie's complaint. In his view, it was "totally inappropriate" and not "in accord with generally accepted police custom and practice" that CRASH, the unit responsible for the alleged constitutional violations, rather than Internal Affairs, conducted the investigation. According to Fyfe, the investigation "contain[ed] a lot of holes and [left] questions unanswered that should have been visible to any reasonable police administrator." He testified that, since both Internal Affairs and Gates did not question it, but instead ratified it, the investigation procedure must be deemed to have been carried out in accordance with official policy.

Fyfe testified about a two-year comparative study he had previously conducted of citizens' complaints and departmental complaints against LAPD officers. He found that complaints brought against officers by the department were almost always sustained while citizen complaints were rarely sustained. Indeed, he noted that pursuant to the LAPD citizen complaint procedure it is "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen," noting that it is as if

"something has to be done on film for the department to buy the citizen's story." This supported the Larezes' theory that officers were encouraged by the absence of independent witnesses to use excessive force, knowing that complaints involving a credibility duel between citizen and officer are never sustained. Although this comparative study covered only June 1979 through June 1981, neither Gates nor the City introduced any evidence to suggest that such trends had changed.

Fyfe also testified that leaving the house turned upside down was "outrageous," a position with which Chief Gates later disagreed at trial. Fyfe testified that he was "offended by" the treatment of Jessie, adding that "any reasonable police administrator would be offended by it." Had he been the chief, Fyfe testified, he would have disciplined the six officers and taken steps to prevent such violations in the future. Fyfe also criticized the manner in which the office of the Los Angeles Police Chief is substantially insulated from discipline or threat of removal.

Later in the trial, Gates testified. Upon departing the courtroom, he was questioned by reporters about his reaction to the $90,000 jury verdict against his officers in the first phase of the trial. Each of at least three Los Angeles newspapers attributed five statements to him. One of the five statements repeated in the various newspapers quoted Gates as saying that Jessie Larez had been lucky that he only had gotten a broken nose. All the statements were admitted over objection.

After hearing the second phase evidence, the jury found the supervisory defendants liable. Each plaintiff received $1 nominal damages against the City and Gates in his official capacity. The jury awarded $7 nominal damages and $170,000 punitive damages against Gates in his individual capacity.

All the defendants moved for a new trial arguing in substantial form the arguments they make here. They now appeal the district court's denial of their motion.

## I. JURISDICTION

■ The Larezes initially raise the issue of this court's jurisdiction to hear the appeal of the six officers. A motions panel of this court has already twice addressed this issue, finding jurisdiction. Generally, this court will not reconsider a question upon which another panel has ruled in the same case. However, this "law of the case" doctrine is "inapplicable to the question of our jurisdiction to consider an appeal." *Duran v. City of Douglas*, 904 F.2d 1372, 1375 (9th Cir.1990) (citing *United States v. Houser*, 804 F.2d 565, 568–69 (9th Cir. 1986)).

■ The Larezes contend that the officers failed to file a timely notice of appeal, which we consider a jurisdictional matter. *Allah v. Superior Court*, 871 F.2d 887, 890 n. 1 (9th Cir.1989). Specifically, the Larezes contend that the notice of appeal was a nullity because it was filed prior to the entry of judgment against the officers. The defendants, however, appealed the denial of their timely new trial motion, not the jury verdict. As it was filed within thirty days of the denial, the notice of appeal was timely. *See* Fed.R.App.P. 4(a)(2); *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, — U.S. ——, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991) (notice of appeal filed after bench ruling but before entry of judgment timely). Moreover, while it is true that the officers filed their new trial motion before the entry of judgment, nothing in Fed.R.Civ.P. 59 prohibits early filings. *See Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 764 n. 1 (9th Cir.1981). *See also Hilst v. Bowen*, 874 F.2d 725, 726 (10th Cir.1989) ("Although Rule 59 motions are to be served not later than ten days after entry of judgment, courts and commentators generally agree that this ten-day limit sets only a maximum period and does not preclude a party from making a Rule 59 motion before a formal judgment has been entered.") (citing 9 J. Moore, B. Ward & J. Lucas, *Moore's Federal Practice* ¶ 204.12[4], at 4–95 (2d ed. 1989); 11 C. Wright & A. Miller, *Federal*

*Practice and Procedure* § 2812, at 81 (1973)).

## II. DISMISSAL OF APPEAL FOR TECHNICAL DEFICIENCIES

■ The Larezes urge us to dismiss the entire appeal for defendants' failure to comply with the Federal Rules of Appellate Procedure and Ninth Circuit Rules. While it is true that defendants did not fully comply with several technical rules, most notably failing to include a statement of issues presented in their opening brief, this does not warrant our bypassing the merits of this appeal. In this case the issues could be gleaned from the argument headings listed in the opening brief's table of contents, and the reply brief contained a formal statement of issues.

*Hamblen v. County of Los Angeles*, 803 F.2d 462 (9th Cir.1986), cited by the Larezes as support for dismissal of the appeal, actually undermines their argument. The *Hamblen* deficiencies were much more grievous than those here, yet we still reached the merits. We dismissed that case not for deficient lawyering, for which sanctions were imposed, but for failure to object to a jury instruction sought to be challenged on appeal. *Id.* at 464.

## III. THE MERITS

### A. LIABILITY OF THE INDIVIDUAL OFFICERS

Defendants raise several bases for reversal of the district court's denial of their new trial motion. Of all those which are alleged to have affected the trial against the individual officers, we find nothing to warrant reversal. Nonetheless, we think it necessary to discuss briefly each basis.

#### 1. *Attorney Misconduct*

■ A district court's denial of a new trial motion is reviewed for an abuse of discretion. *Hard v. Burlington N.R.R.*, 812 F.2d 482, 483 (9th Cir.1987). To grant a new trial because of attorney misconduct, "the flavor of the misconduct must [have] sufficiently permeate[d] [the] entire proceeding to provide conviction that the jury

was influenced by passion and prejudice in reaching its verdict." *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir.1983) (citation omitted).

Defendants have raised scores of instances of alleged misconduct, suggesting that, in the end, the totality of the circumstances warrants reversal of the denial of the motion for new trial. Because they allege so many grounds, they appear to have neither the energy nor the space to describe each in their opening brief. Instead, they break the examples of alleged misconduct into categories and follow each with string citations to the trial record. The categories of misbehavior chronicled by defense counsel include: (1) repeated interjections of rude, cruel, improper comments adversely affecting the case, the defendants, their witnesses, and their counsel; (2) attempts to embarrass, harass, badger the same; (3) repeated interjections of personal knowledge; (4) personal opinions concerning the culpability of witnesses and the justness of appellees' case; (5) the use of artifice and trickery to obscure true issues; and (6) inappropriate objections contrived to put nontestimonial assertions before the jury. Similarly, the reply brief lists many examples of misconduct.

After reviewing the allegations, we believe that many of the comments were not improper. Generally, the district court maintained suitable control, sustaining objections when justified and properly advising the jury to disregard inappropriate comments by counsel. Some comments and tactics, on the other hand, may well have exceeded the bounds of conduct we expect from attorneys. Nonetheless, while we find deplorable the vituperation for which both sides share responsibility in this case, we do not believe that the district court abused its discretion in failing to find that any misconduct which may have existed so permeated the case that it improperly influenced the jury.

#### 2. *Evidentiary Rulings*

■ Defendants complain about two evidentiary rulings of the district court. The court excluded evidence that defendants

wanted a SWAT team to make the entry into the plaintiffs' home, and that two other searches of other homes made by the same officers on the day of the search of the Larez home did not employ the "crisis entry" technique. Its evidentiary rulings are reviewed for an abuse of discretion, and will not be reversed absent a showing of prejudice. *Roberts v. College of the Desert*, 870 F.2d 1411, 1418 (9th Cir.1988) (citation omitted).

 Defendants contend that they were prejudiced by the court's refusal to let them explain that they wished to have a SWAT team serve the search warrant because plaintiffs' counsel was able to imply that the defendants went to the Larez home on a "personal vendetta to 'kick ass'." Plaintiffs argue that there was no showing of relevancy. Plaintiffs correctly note that the defendants, not the SWAT team, served the warrant, and that the defendants already had testified as to their state of mind. While the request for use of a SWAT team did tend to undermine any assertion that the defendants went on a personal vendetta, its admission may have been unfairly prejudicial under Fed.R.Evid. 403, as it implied that the Larezes were especially dangerous. Excluding this evidence, therefore, was not an abuse of discretion.

 The court also excluded evidence that, on the same day the Larez home was searched, the same officers searched two other houses without resorting to the "crisis entry" approach. This, defendants claim, "went to the legitimacy of the officers' fears concerning Jessie Larez's potential for armed confrontation." ("[I]t's just to show their state of mind and their absolute good faith in the information they were acting upon in serving the warrant in this particular place.") The Larezes and the court both took the position that evidence of the manner of the other searches was irrelevant as the Larezes conceded

that the search warrant was supported by probable cause. Again, defendants were permitted to testify as to their state of mind: that they believed this search was particularly fraught with danger. Exclusion of this additional evidence was not an abuse of discretion.

### 3. Jury Instructions

Defendants complain that throughout the trial, plaintiffs' counsel argued "over and over again the illegality of the arrest of Eddie Larez without an arrest warrant." They contend that this was exacerbated when the court instructed the jury over objection that a "warrantless arrest in a non-public place is presumptively unreasonable and violative of the Fourth Amendment."

 In a civil case, we may not review a jury instruction in the absence of a proper objection. *See Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir.1991) (*en banc*) (recognizing this court's strict interpretation of Fed.R.Civ.P. 51 as containing no "plain error" exception); *see also* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2558, at 674 (1971) (same). The defendants' sole objection to the proposed instruction was that it "misstates the law and is not applicable to the facts of this case." By failing to explain their present contention that the officers believed they had a right to arrest Eddie anytime pursuant to his parole agreement, the objection failed to state "distinctly the matter objected to and the grounds of the objection...." *Grosvenor Properties Ltd. v. Southmark Corp.*, 896 F.2d 1149, 1153 (9th Cir.1990); *Brown v. Avemco Inv. Co.*, 603 F.2d 1367, 1371 (9th Cir.1979) (" 'Rule 51 was designed to prevent unnecessary new trials caused by errors in instructions that the district court could have corrected if they had been brought to its attention at the proper time.' ") (citation omitted). In the absence of a sufficient objection, we cannot review the jury instruction.[2]

---

2. Even if we considered the objection to be sufficiently specific, and further found the instruction improper, we nevertheless would find any error harmless under the circumstances, especially as the instruction correctly stated the

law, defendants' contrary contentions notwithstanding. *See United States v. Alvarez*, 810 F.2d 879, 881 (9th Cir.1987) (citing *Payton v. New York*, 445 U.S. 573, 586–89, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)).

#### 4. *Administration of Federal Rule of Evidence 611(a)*

Federal Rule of Evidence 611(a) requires that the district court exercise reasonable control over the examination of witnesses so as to "(1) make the interrogation of witnesses and presentation effective for the ascertainment of the truth, ... and (3) protect witnesses from harassment or undue embarrassment." Defendants essentially make the same allegations here that they made with respect to attorney misconduct. Administration of the Rules of Evidence is reviewed for an abuse of discretion. *Roberts*, 870 F.2d at 1418. Just as we found there was no attorney misconduct warranting a new trial, we find the court's administration of Rule 611(a) was not an abuse of its discretion.

#### 5. *Punitive Damages*

Defendants contend that the court improperly instructed the jury on punitive damages and that the jury's award of punitive damages was "grossly excessive."[3] The court instructed the jury that, in its discretion, it could impose punitive damages upon the individual officers once finding liability. It explained that punitive damages would be appropriate only if the jury found the officers' injurious acts were "maliciously," "wantonly," or "oppressively" done. The court further emphasized that punitive damages must be "fixed with calm discretion."

■■■ The individual defendants argue on appeal that due process was violated because punitive damages were imposed upon a standard less than actual malice. This argument, however, cannot be considered on appeal because defendants failed to object to the punitive damages instruction in the district court. *See Hammer*, 932 F.2d at 847. Even so, defendants are mistaken on the merits. *See Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1982) (jury may assess punitive damages under § 1983 when defendants' conduct involves "reckless or callous indifference to the federally protected rights of others"; actual intent or malice not required).

■■■ Defendants also argue that the amounts of the punitive damages awards assessed against them were excessive. Against the individual officers, the following compensatory/punitive damage award ratios resulted: Diane, $1/$300 per officer; Keiko, $1/$300 per officer; Frank, $1/$300 per officer; Jessie, $20,000/$25,000 against Holcomb, $5,000 per each remaining officer; Albertdee, $50/$300 per officer; Armida $2,000/$10,000 per officer; Katsumi, $40/$300 per officer. The district court properly instructed the jury that punitive damages "must be fixed with calm discretion and sound reason, and must never be ... awarded ... because of sympathy, or bias, or prejudice...." We cannot find that the jury did not follow this admonition. The figures do not seem "monstrous" in light of the evidence the jury heard about these officers' actions. That damages were specifically tailored to the degree of harm each plaintiff withstood indicates to us that the jury was operating lawfully and was not inflamed. We, therefore, do not find the amounts of punitive damages awarded against the individual officers were "grossly excessive, monstrous or shocking to the conscience." *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir. 1988).

In sum, we conclude that the motion for new trial was properly denied as to all the individual officers' claims; the jury's verdict against them stands.

#### B. LIABILITY OF CHIEF GATES AND THE CITY

Although in their reply brief Gates and the City raise more than a dozen issues, their appeal essentially boils down to the following four issues: (1) the propriety of proceeding with the second phase of trial; (2) the admissibility of the newspaper quotations; (3) the sufficiency of the evidence;

---

**3.** We separately discuss Gates's challenge to the award of punitive damages against him below.

*See infra* III.B.4.

and (4) the propriety of the punitive damages award against Gates.

### 1. *The Propriety of Proceeding with the Second Phase of Trial*

■ Gates and the City contend that the trial court erred in proceeding with the second phase of the trial once liability had been found and damages assessed against the individual officers. It is true that the Larezes did not seek additional compensatory damages in the second phase, nor, as a matter of law, could they seek punitive damages against the City or against Chief Gates in his official capacity. Thus, they argue that, because no more compensatory damages could have been awarded, there was no actual case or controversy before the court, citing *Sanchez v. City of Riverside*, 596 F.Supp. 193 (C.D.Cal.1984).

■ *Sanchez* is easily distinguished. There, dismissal of the case against supervisory officials was predicated explicitly upon the plaintiff's failure to allege a separate and distinct wrong from that found and compensated for in an earlier phase against an individual officer.[4] Here, proceeding with the second phase was perfectly appropriate because plaintiffs did allege that Gates and the City committed constitutional violations distinct from those committed by the individual officers. Thus, to the extent that the Larezes were made whole by the award against the officers, nominal damages were still available in the second phase. *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (nominal damages available under 42 U.S.C. § 1983). In *Carey*, the Court reasoned that "[b]y making the deprivation of [certain absolute] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights remain scrupulously observed...." *Id.* The court found that procedural due process was such an "absolute" right. We find that the rights § 1983 protects here, freedom from unreasonable searches and sei-

zures and the right to bodily integrity, are of similar stature. Therefore, it was appropriate to proceed with the second phase for the purpose of vindicating those constitutional rights, through the awarding of nominal, yet symbolic, damages, which Gates (in his official capacity) and the City were found to have violated.

■ The second phase also was properly initiated to adjudicate the individual liability and punitive damage claims against Gates. He suggests that the second phase was limited to *Monell* liability and, therefore, we cannot rely on his potential individual liability for either compensatory or punitive damages as a justification for the court proceeding with the second phase. Central to this claim is his assertion that he was never named in his individual capacity. "In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of the proceedings in such cases typically will indicate the nature of the liability sought to be imposed.'" *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting *Brandon v. Holt*, 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985)). Here, the "course of the proceedings" reasonably indicated that Gates was being sued in his individual capacity.

First, the title of the case named Gates but did not refer to his official position or representative capacity. Second, in denying defendants' dismissal motion prior to the commencement on the second phase, the district court necessarily concluded that Gates was sued in both individual and official capacities. Third, plaintiffs' counsel expressly noted that Gates was sued in his individual capacity in plaintiffs' response to the motion to dismiss. Fourth, Gates requested, and received, jury instructions on qualified immunity. Such an immunity is only a defense in an individual capacity suit. *Graham*, 473 U.S. at 166–67, 105 S.Ct. at 3105–06. Last, the complaint

---

**4.** Our view of the importance of vindicating constitutional rights, even through a symbolic award of nominal damages, *see, infra,* may counsel a contrary result from *Sanchez* in the

future. But because the facts of this case do not require it, we do not decide the propriety of *Sanchez*'s rule where no separate harm is alleged.

sought punitive damages against Gates, which are only available against a supervisory official in his individual capacity. *See Smith*, 461 U.S. at 35–36 & n. 5, 103 S.Ct. at 1629–30 & n. 5; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, it is clear that Gates knew, or should have known, that he was being sued in his individual capacity.

Even if Gates only learned of his susceptibility to individual liability upon denial of the motion to dismiss, this late notice does not justify reversal here, particularly as Gates failed to move for a continuance on the ground that he was unprepared to present a defense on individual liability. His failure to request a continuance undermines any claim that he was harmed by not being made aware earlier that the suit was proceeding against him in both capacities.

Finally, in many cases, a plaintiff may seek to proceed against the supervisory officials after a victory against an individual officer for the purpose of securing the judgment in the event the individual officer cannot pay it.

## 2. The Admissibility of the Newspaper Quotations

After testifying, Gates was questioned by reporters in the courthouse corridor. The next morning, articles in the *Los Angeles Times*, the *Herald–Examiner*, and the *Daily News* attributed certain statements to Gates. The variance between the quotations was minimal, and the substance of the quotations was substantially corroborated by all three newspapers.

The following five statements were attributed to Gates:

1. "How much is a broken nose worth?"

2. "$90,000? I don't think it's worth anything. He's probably lucky that's all he has."

3. "Given the circumstances in this case, I don't think it's worth anything. [Larez] is probably lucky that's all he had broken."

4. "They [the jurors] see the family there all cleaned up.... They don't know their background, that there is a gang member on parole. They get very sympathetic."

5. "I tell my officers to do something—and we do something and they give them $90,000."

The Larezes' counsel sought to admit into evidence these statements and reactions to the statements by Jessie and Armida.

### a.

After hearing both sides, the court admitted the statements. Finding the quotations relevant, the court also found them to be nonhearsay. Further, it explicitly undertook the balancing required by Fed. R.Evid. 403, concluding that "probative value is not far exceeded by the prejudicial effect, in that these statements made by the Chief are the type of statements that I would refer to as invited prejudice...."

▬▬▬ We review the district court's decision to admit evidence over a hearsay objection for abuse of discretion. *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir.), *cert. denied*, 488 U.S. 890, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). Likewise, we review its Rule 403 balancing for an abuse of discretion. *See United States v. Portac, Inc.*, 869 F.2d 1288, 1297 (9th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

▬▬▬ While we find the court's balancing was not an abuse of discretion,[5] we

---

**5.** There is no question that this evidence was particularly damning. But Fed.R.Evid. 403 only concerns itself with *unfair* prejudice. Unfair prejudice involves an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403, Notes of Advisory Committee on 1972 Proposed Rules. Whatever prejudice derives from admission of the quotations, it is not the kind against which Rule 403 protects. Of course, the jury likely relied on the state-

ments to find Gates liable. In this sense, Gates's statement certainly affected, or prejudiced, his defense. But, assuming the statements were made as reported—an assumption defendants have never undermined by asserting that the statements were either fabricated or misunderstood—the prejudice was *fair*, and did not lead to a decision on an improper basis. We cannot say the court abused its discretion by finding no

conclude that the statements were erroneously admitted hearsay, and that their admission was not harmless. While defense counsel requested that the Larezes put the reporters on the stand, and while the Larezes were apparently prepared to do so, the court unfortunately believed such a step unnecessary. Here, it erred.

Defense counsel has never claimed the quotations were complete fabrications. Instead, by focusing on the context and transcription of those statements, he called attention to the need for cross-examination of the reporters, requesting that "before they're admitted, ... the persons who wrote up these articles [be called to] testify and be subject to [his] voir dire as to the circumstances in which these were offered...." By so doing, he implicitly recognized that the statements' admissibility hinged on *two* out-of-court statements: (1) Gates's actual statements and (2) their later repetition by reporters.

■ Gates's actual out-of-court statements pose no admissibility problem. The statements clearly are relevant. They are probative of central issues in the case— Gates's recklessness and callous indifference, and customs and policies of the LAPD. In addition, they are admissible nonhearsay either as admissions of a party opponent, *see* Fed.R.Evid. 801(d)(2)(A), or because they are not offered for the truth of the matter asserted (i.e., not offered to prove that a broken nose is worth less than $90,000, but rather to show Gates's state of mind), *see* Fed.R.Evid. 801(c). Because Gates's statements were properly considered nonhearsay, their admission technically does not pose a double hearsay problem. *See, e.g., United States Football League v. Nat'l Football League,* 1986–1 Trade Cas. (CCH) ¶ 67,101 at 62,667, 1986 WL 5803 (S.D.N.Y.1986) (recognizing that statements of belief by unknown declarants reiterated in newspaper article constituted double hearsay).

■ The statements' repetition in the newspapers, however, posed a more difficult problem which the district court failed

to address. As the reporters never testified nor were subjected to cross-examination, their transcriptions of Gates's statements involve a serious hearsay problem. First, the reporters' transcriptions were out-of-court statements. By attributing quotations to Gates, the reporters necessarily made the implicit statement, "Gates said this!" As the reporters' statements were made in newspapers, they were, *a fortiori,* statements made out-of-court where they were not subject to the rigors of cross-examination. Second, the statements— "Gates said this!"—were offered for the truth of the matter asserted: that Gates did in fact make the quoted statement.

The only exception which colorably applies to these hearsay statements is Fed. R.Evid. 803(24). Among those statements not excluded by the hearsay rule is

[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted into evidence under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial on hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The touchstone of this exception is trustworthiness equivalent to that of the other specific hearsay exceptions.

While newspaper articles have been held inadmissible hearsay as to their content, *see, e.g., Pallotta v. United States,* 404 F.2d 1035 (1st Cir.1968); Annotation, *Admissibility of Newspaper Article as Evi-*

unfairly prejudicial aspect substantially outweighed the probativeness of Gates's comments.

*dence of the Truth of the Facts Stated Therein,* 55 A.L.R.3d 663 (1974), few cases have addressed this question in light of the requirements of Rule 803(24). *See May v. Cooperman,* 780 F.2d 240 (3d Cir.1985); *United States Football League,* 1986–1 Trade Cas. (CCH) ¶ 67,101 at 62,668–669, 1986 WL 5803 (S.D.N.Y.1986); *Democratic Party of the United States v. Nat'l Conservative Political Action Comm.,* 578 F.Supp. 797, 833 n. 53 (E.D.Pa.1983). In *May,* for example, newspaper accounts discussing legislative motives behind a school prayer bill had been admitted by the district court for use by school prayer opponents to prove legislative purpose under the *Lemon* test where no official legislative history for the bill existed. The panel majority, recognizing some problems with admissibility under Rule 803(24), ultimately did not pass on the 803(24) question for it found that, even if admission on that basis had been erroneous, such error was harmless because the evidence was cumulative. *Id.* at 252 n. 9.

Dissenting on other grounds, Judge Becker, however, examined the Rule 803(24) question more carefully. *Id.* at 262–63 & nn. 10–14. Among other things, he found that the newspaper accounts of the legislative hearings (of which there was no official record) lacked the " 'circumstantial guarantees of trustworthiness' " because they might have "been written from a biased point of view." *Id.* at 263. Judge Becker added, "[i]t is not unknown for reporters to stretch some facts or omit others...." *Id.* He also found that subsection B of Rule 803(24) was not satisfied because the proponents of the evidence failed to make a "showing of inability to locate observers who attended the legislative debates...." *Id.*

Similarly, in *United States Football League,* newspaper reports attributing statements to unknown declarants were excluded, as double hearsay, both as insufficiently trustworthy and as less probative than "other evidence which the proponent [could] procure through reasonable efforts." *Id.* at 62,668–669. There, with respect to trustworthiness, the court specifically noted that newspaper articles "are often challenged by interested parties as inaccurate." *Id.* at 62,668. The court was concerned that admission of articles containing statements of unknown declarants "could be the subject of widespread abuse if admitted into evidence under [Rule 803(24)] *in any but the most extraordinary circumstances.*" *Id.* (emphasis added).

We quarrel with neither court's concerns about the trustworthiness of evidence sought to be admitted under Rule 803(24); indeed, they are concerns we share. Courts may well question whether an out-of-court statement, merely because it appears in newsprint, is sufficiently reliable. In the "extraordinary circumstances" of this case, *see id.,* however, where three independent newspapers attributed the same quotations to Gates, a known declarant who testified at trial, we believe the statements have "circumstantial guarantees of trustworthiness" at least equivalent to those of many of the other hearsay exceptions.[6] Moreover, we find that subsections A and C of Rule 803(24) are satisfied as the statements are offered as evidence of a material fact,[7] and the purpose of the rules and the interests of justice

---

6. Indeed, precedent in this circuit would support a finding of trustworthiness here. *See United States v. Friedman,* 593 F.2d 109, 119 (9th Cir.1979) (Rule 803(24) analysis looks to circumstance of declaration to make inferences about declarant's "perception, memory, narration, or sincerity concerning the matter asserted...."). Under such a standard, the newspaper accounts seem sufficiently reliable. The perception, memory, narration, and sincerity of the several declarants is especially reliable because the declarants corroborated one another.

7. Although neither of the parties argue about the admissibility of the alleged quotations statement-by-statement, there may be good reason to distinguish between the first three statements (which clearly go to issues in this case) and the fourth and fifth statements which seem both less probative of issues in the case, and more unfairly prejudicial in that they run the greater risk of inflaming the jury. This is especially so where the jury Gates criticized is the same one that sat over his case. Our disposition of this case, however, does not necessitate that we make such a distinction here.

support admissibility, especially as Gates has never disputed that he made the statements.

▉▉ It is with respect to subsection B of Rule 803(24), however, that we are unable to countenance the statements' admission. By requiring that "the statement [be] more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," that subsection essentially creates a "best evidence" requirement. The statements' admission, therefore, was erroneous because the newspaper quotations were not the best available evidence of what Gates said; testimony from the reporters themselves would have been better.[8] The Larezes knew as much for they had the reporters subpoenaed and apparently ready to testify. We cannot fault defense counsel for he specifically requested an opportunity to cross-examine the reporters before the evidence was admitted. Thus, the error was the failure to take testimony from, and particularly to allow the cross-examination of, the reporters who repeated Gates's comments.[9] *See Cooperman*, 780 F.2d at 263 (Becker, J., dissenting) (newspaper article was not the most probative evidence that could be procured by reasonable efforts); *United States Football League*, 1986–1 Trade Cas. (CCH) ¶ 67,101 at 62,668–669 (same).

▉▉ Notwithstanding the statements' erroneous admission, we still must determine whether their admission caused sufficient prejudice to substantial rights to warrant reversal. *See Roberts*, 870 F.2d at 1418. *See also* Fed.R.Evid. 103(a) (error must affect "substantial rights"). We simply cannot conclude otherwise. First, the statements were among the strongest evidence of Gates's tolerance for, and endorsement of, his officers' use of excessive force. Indeed, the Larezes' counsel conceded as much in his closing argument.[10] Second, to the extent that some of the admitted statements were critical of the jury, there is danger the jury may have been inflamed. Third, the denial of the right to cross-examine the reporters may have deprived Gates of the opportunity to show the context in which the statements were made. Last, plaintiffs' counsel compounded the error by his nearly singular reliance on the statements in closing argument. He repeatedly referred to the statements, which he emphasized to show Gates's purported contempt for the judicial process and for the jury, urging the jury to find Gates liable because "we don't want him going out after he sits in here in front of you solemnly telling everyone to just go eat it." Given all this, we cannot say that the statements' admission, which violated Gates's substantial right to cross-examine witnesses against him, more likely than not did not improperly influence the jury. *See Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir.1983) ("when an appellate court ponders the probable effect of an error on a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error.").

b.

In conjunction with their attack on the admissibility of the newspaper quotations, Gates and the City also claim that allowing Jessie and Armida to testify about the

---

**8.** Admissibility may also have been improper here because defense counsel had insufficient time to prepare his arguments. Because we find admissibility improper under subsection B, we need go no further.

**9.** We do not decide whether, upon retrial, should there be one, the newspaper quotations may be admitted under Rule 803(24). We cannot, of course, predict what evidence will be presented at retrial.

**10.** He told the jury:

And look at what Daryl Gates did yesterday. Sat in here for three and half hours, and I questioned him. And I felt, "My God, I haven't gotten anywhere with this guy," I had never been able to crack him. He is tough. I was exhausted when I was done.

And I thought, taking my second shot at him, and I haven't cracked him this time, he's a cold guy....

And then, as what happened, he walked outside the courtroom, and he told everybody what he really thought.... He didn't think that what he said outside the courtroom could be brought in here to this courtroom and used against him....

newspaper quotations' emotional effect on them was erroneous. Their complaint is two-fold: first, that it was improper for the jury to be allowed to award damages for intentional infliction of emotional distress; and, second, that the use of the quotations violated Gates's right to freedom of expression.

If the nature of the evidentiary error committed at trial were such that we believed it highly unlikely that the same evidence might properly appear in the second trial, we would, of course, leave these issues unaddressed. But because it is quite possible that Gates's statements will be admitted in some form upon retrial, we pass on these questions now in the interest of judicial economy.

■ Neither argument is persuasive. First, the jury was never even instructed on the law of intentional infliction of emotional distress. As only nominal compensatory damages were awarded against Gates, we may infer that the jury gave no emotional distress damages.

■ Second, while it may be true that Gates could not be held liable for emotional distress consistent with the first amendment for expression of his opinions *qua* opinions, *see Ault v. Hustler*, 860 F.2d 877, 880 (9th Cir.1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989), defendants' implied assertion that the first amendment prohibits using the statements against Gates in any manner is absurd. Where the principal allegations in this case include among them that Gates set a tone which condoned and encouraged the use of excessive force, we can hardly think of better evidence than statements consistent with those claims. *See McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after [constitutional violations], ... officials took no steps to reprimand or discharge the[ir subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error.") (citation omitted); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985) ("subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting dis-

position and policy") (cited with approval in *McRorie*, 795 F.2d at 784), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). To the extent the opinions of Chief Gates shed light on the operation, custom, or policy of his department, or on his ratification or condonation of the injurious acts, his statements, if admitted upon retrial, may, of course, be used as evidence on the issue of his liability and that of the City.

### 3. *The Sufficiency of the Evidence*

Gates and the City contend that "[t]here was nothing in the record ... to implicate the personal liability of Chief Gates or to implicate the [supervisory] liability of any defendant." They correctly concede that, because they failed to move for a directed verdict, we must review their sufficiency claim for plain error. *See Benigni v. City of Hemet*, 879 F.2d 473, 476 (9th Cir.1988).

#### (1). *Gates*

The distinction between Gates's individual and official capacity liabilities, the proof of which oftentimes overlaps, is made more subtle by the supervisory role that he occupies. A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury. Yet, this does not prevent a supervisor from being held liable in his individual capacity. Like the officers, Gates's individual liability hinges upon his participation in the deprivation of constitutional rights. But unlike the officers' involvement, which ordinarily is direct and personal, his participation may involve the setting in motion of acts which cause others to inflict constitutional injury. *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir.1978).

■ Gates's official liability, on the other hand, is distinguished by the source of the constitutional harm; it must be attributable to official policy or custom. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); *Shaw v. California Dept. of Alcoholic Beverage Control*, 788 F.2d 600,

610 (9th Cir.1986). To the extent that the terms "policy" and "custom" imply something beyond a single decision, official liability may also be imposed where a first-time decision to adopt a particular course of action is directed by a governmentally authorized decisionmaker. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Evidence that there was a custom or policy to use excessive force, for example, would be sufficient to warrant the imposition of official liability under *Canton* and its progeny. Also, evidence that Chief Gates, an authorized policymaker on police matters, *see Reporter's Transcript*, Dec. 1: 5 ("the Chief of Police is an official whose acts constitute final official policy of the City of Los Angeles"), made, or ratified a decision that deprived plaintiffs of their constitutional rights would suffice for official liability under *Pembaur*. *See* Annotation, *What Constitutes Policy or Custom for Purposes of Determining Liability of Local Government Unit Under 42 U.S.C.S. § 1983—Modern Cases*, 81 A.L.R.Fed. 549, 558 (1987) ("Actions taken by officials ... with policymaking authority—typically defined to include actions by those individuals or entities whose actions are final—have generally been held to represent official policy for purposes of determining [municipal] liability.").

### (a). *Individual capacity liability*

■ The district court correctly instructed the jury that it could find Chief Gates liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury." *Reporter's Transcript*, Dec. 1: 5–6. *See also McRorie*, 795 F.2d at 783. Supervisory liability is imposed against a supervisory official in his individual capacity for his "own culpable action or inaction in the training, supervision, or control of his subordinates," *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir.1987); for his " 'acquiesce[nce] in the constitutional depriva-

tions of which [the] complaint is made,' " *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir.1988) (citation omitted); or for conduct that showed a " 'reckless or callous indifference to the rights of others.' " *Bordanaro*, 871 F.2d at 1163. It was not plain error for the jury to find any one of these standards fulfilled.

■ The Larezes alleged that, in his individual capacity, Gates was responsible for their constitutional deprivations because he condoned, ratified, and encouraged the excessive use of force. Their expert witness, armed with both many years of practical police experience and empirical data on police department procedures and operations nationwide and in Los Angeles specifically, testified that, had he been in Chief Gates's shoes, he would have disciplined the individual officers and would have established new procedures for averting the reoccurrence of similar excesses in the future. Yet, neither step was taken by Gates. Instead, he signed a letter informing Jessie Larez that none of his many complaints would be sustained, thereby ratifying the investigation into the Larezes' complaint. The jury's verdict was not in plain error.

### (b). *Official capacity liability*

■ A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself. *McRorie*, 795 F.2d at 783. Thus, Gates could have been found liable in his official capacity only if " ' "policy or custom" [or a one-time decision by a governmentally authorized decisionmaker (*see Pembaur*, 475 U.S. at 481 [106 S.Ct. at 1299])] ... played a part in the violation of federal law,' " *McRorie*, 795 F.2d at 783 (citation omitted); *Shaw*, 788 F.2d at 610. We find that there was sufficient evidence to warrant a finding of official capacity liability.

Gates is an official policymaker for the City on police matters. *Reporter's Transcript*, Dec. 1: 5. *See also Shaw*, 788 F.2d at 611 ("As to the City, the policies of the Police Department became its policies because the policies set by the Department

and its Chief 'may be fairly said to represent official [City] policy' on police matters.") (citation omitted). Professor Fyfe testified that the Larezes' complaint was investigated in accordance with LAPD policy or custom. Pursuant to it, the unit being investigated, CRASH, was given the responsibility of passing upon the complaints' many allegations, none of which were sustained. Fyfe found this procedure improper. He concluded that the investigation "contain[ed] holes" and inconsistencies "that should have been visible to any reasonable police administrator." For example, it relied in part upon testimony of an officer, Sergeant Mazur, to substantiate the officer defendants' claims that they did not engage in excessive force, even though Mazur was not present during some of the relevant incidents.

The LAPD's treatment of the Larezes' complaint tended to corroborate Fyfe's testimony about LAPD complaint investigations in general. As we have indicated in our factual discussion, pursuant to his two-year study of LAPD complaints, which was unrebutted by defendants, Fyfe concluded that it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen," noting that it was as if "something has to be done on film for the department to buy the citizen's story." The jury was entitled to conclude that this evidence supported the Larezes' theory that the LAPD's disciplinary and complaint processes, executed by policy or custom, contributed to the police excesses complained of because the procedures made clear to officers that, at least in the absence of independent, third-party witnesses, they could get away with anything. Officer Holcomb's statement, "I could blow your fucking head off right here and nobody can prove you did not try to do something," made while Holcomb pointed his gun in Jessie's face, tended to corroborate this theory.

Aside from these allegedly flawed procedures, there was evidence of a departmental policy or custom of resorting to the use of excessive force. The jury properly could find such policy or custom from the failure of Gates to take any remedial steps after the violations. *McRorie*, 795 F.2d at 784 (custom inferred from failure to reprimand or discharge); *Grandstaff*, 767 F.2d at 171 ("subsequent acceptance of dangerous recklessness by policymaker tends to prove his preexisting disposition *and policy*") (emphasis added). Gates's statements, coming from a final policymaker on police matters, also properly could have been considered to represent the LAPD's policy or custom of condonation of, and acquiescence in, the use of excessive force by its officers.

Additionally, when questioned about the Larezes' home being left "turned upside down," Gates testified that he believed officers were better off not trying to put things back in the place. Notwithstanding Gates's assertions that this constituted neither LAPD policy or custom, the jury could have found otherwise. Sergeant Mazur testified that in the hundreds of LAPD searches he witnessed, officers never put back displaced items. The jury could have found that this substantiated the existence of LAPD custom. Furthermore, as Gates speaks for the City on police matters, it was permissible for the jury to have concluded that his testimony, that officers are better off not trying to replace items after a search, represented LAPD custom. This custom of treating search victims' property with such disregard could have been used by the jury to bolster its conclusion that the LAPD engaged in unreasonable searches. The jury's verdict did not constitute plain error.

#### (2). *The City*

With respect to its liability for the Larezes' constitutional injuries, the fate of the City hinges on Chief Gates's official capacity liability. *See Reporter's Transcript*, Dec. 1: 5 ("[I]f you find that the acts of the Police Chief in his official capacity deprived plaintiffs of their constitutional rights, the City of Los Angeles will be liable for such deprivations."); *Shaw*, 788 F.2d at 611 (police department policies deemed city policies). *See also Gibson v. City of Chicago*, 910 F.2d 1510, 1519 n. 14 (7th Cir.1990) (court's disposition of munici-

pal liability claim pertained both to claim against the City and claim against Police Superintendent in his official capacity). Having found no plain error in the jury's verdict on Gates's official liability, we must find the same with respect to the City.

#### 4. The Propriety of the Punitive Damages Award Against Chief Gates

In addition to contesting the sufficiency of the evidence as to his individual liability for compensatory damages, Gates argues that the imposition of punitive damages against him was improper under the due process and excessive fines clauses of the United States Constitution. Moreover, he appears to contest the sufficiency of the evidence to warrant punitive damages. Finally, he claims that the amount of the punitive award was "so excessive as to be monstrous and shocking."

We have already concluded that the due process component of his argument, which assumes the district court set the punitive damages threshold impermissibly low in its instructions to the jury, is foreclosed by his failure to object to the court's instruction on punitive damages. *See supra*, III.A.5. Nonetheless, because this may likely remain an issue of contention upon remand, in the interest of judicial economy we discuss the merits of Gates's argument.

■ In contending that the district court violated his due process rights by permitting the jury to award punitive damages upon a lower standard than that of actual malice, Gates is plainly mistaken. In *Smith*, 461 U.S. 30, 103 S.Ct. 1625, the Supreme Court laid to rest this argument. It specifically found appropriate the precise standard relied upon by the district court here. *Id.* at 40 n. 8, 51, 56, 103 S.Ct. at 1632 n. 8, 1637, 1640. While it is certainly true that the underlying substantive legal standard for liability for mere compensatory damages here may be the same as, or partially coextensive with, the standard for punitive damages, this is of no moment. *Id.* at 54–55, 103 S.Ct. at 1639–40 ("[S]ociety has an interest in deterring and punishing all intentional or reckless invasions of the rights of others, even though it sometimes chooses not to impose any liability for lesser degrees of fault."); *id.* at 51–52, 103 S.Ct. at 1637–38. *Smith* expressly sanctioned an overlapping standard for compensatory and punitive damages noting that the common-law has never required a higher threshold for punitive damages. *Id.* at 53, 103 S.Ct. at 1638. Moreover, it noted that, in some sense, it was not "entirely accurate to say that punitive and compensatory damages were awarded in [that] case on the same standard" because the purely discretionary nature of punitive damages required not only a finding that the "conduct met the recklessness threshold (a question of ultimate fact), but also that [the] conduct merited [the particular punitive award imposed] in addition to the compensatory award (a discretionary moral judgment)." *Id.* at 52, 103 S.Ct. at 1638.

■ Likewise, we find meritless Gates's contention that punitive liability is inappropriate in this case because the Supreme Court "never has suggested that punishment is as prominent a purpose under [§ 1983] as compensation and deterrence." *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981). In no way does *Fact Concerts* undermine the propriety of awarding punitive damages in this case. First, rather than holding that punishment is an invalid aim under § 1983, *Fact Concerts* implicitly recognized that, while perhaps not the prominent purpose, punishment is a permissible purpose of § 1983 liability. *Id.; see also Carey v. Piphus*, 435 U.S. 247, 257 n. 11, 98 S.Ct. 1042, 1049 n. 11, 55 L.Ed.2d 252 (1978). Moreover, the Supreme Court has noted expressly that deterrence is a primary, and common, purpose of both § 1983 liability and punitive damages, in general. *Smith*, 461 U.S. at 49, 103 S.Ct. at 1636. If sufficient evidence warrants its imposition (a question we examine below), a punitive damages award in this case would further the aim of deterring future egregious conduct by police supervisors. This is especially so in cases where compensatory damages have already been awarded fully

against other defendants (in a bifurcated case like this) or where constitutional rights have been violated maliciously or recklessly but the victim can prove no compensable injury. In such cases, punitive damages may be the only significant remedy, see *id.* 55 n. 21, 103 S.Ct. at 1639 n. 21 (quoting *Carlson v. Green,* 446 U.S. 14, 22 n. 9, 100 S.Ct. 1468, 1473 n. 9, 64 L.Ed.2d 15 (1980)), and their spectre may be the only credible deterrent against constitutionally abhorrent behavior.

■ We now turn to whether there was sufficient evidence to support the specific punitive damages award against Gates. As we have noted, the standard for Gates's individual liability for compensatory damages largely overlaps the standard for punitive damages to the extent that both look to Gates's reckless or callous disregard or indifference to the Larezes' constitutional rights. Considering the same record of evidence, we obviously cannot say that it would be irrational for a jury to have found recklessness or callous indifference for the purpose of assessing punitive liability, where we have already held that there was sufficient evidence of recklessness or callous indifference (if not affirmative condonation and ratification) for the purpose of imposing ordinary compensatory liability.

As in *Smith,* the district court here properly distinguished between the mandatory imposition of compensatory damages once a violation is found, and the discretionary imposition of punitive damages. Once the threshold standard for punitive damages is met (which, as here, may be the same as the substantive standard for ordinary liability), we cannot review the jury's decision to award punitive damages, which represents its discretionary moral judgment about Gates's culpability, *see Smith,* 461 U.S. at 52, 103 S.Ct. at 1638, other than for gross excessiveness. Because we reverse and remand this case on other grounds and therefore vacate the punitive damages award, we deem it unnecessary to decide whether the $170,000 punitive damages award is excessive under the circumstances.

## IV. ATTORNEY'S FEES AND COSTS ON APPEAL

■ The Larezes request attorney's fees and costs on appeal. As parties who have succeeded on significant issues in this appeal, they are entitled to attorney's fees under 42 U.S.C. section 1988. *See Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 791–92, 109 S.Ct. 1486, 1492–93, 103 L.Ed.2d 866 (1989). When a party meets with partial success on appeal, we have deemed it proper to award fees only for those claims successfully defended on the merits. *See, e.g., Connor v. City of Santa Ana,* 897 F.2d 1487, 1494 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990); *Cabrales v. County of Los Angeles,* 864 F.2d 1454, 1464 (1988). Therefore, we award fees to the Larezes for time spent on appeal defending the jury verdicts against the individual officers. Because the claims against Gates and the City have been remanded for a new trial, however, we deem it inappropriate to award fees for defending the verdicts against them at this time. Further fees would be proper if the Larezes prevail on retrial. Pursuant to Ninth Circuit Rule 39–1.6, within thirty days of the filing of this opinion the Larezes are to file an itemized proposal of rates and hours worked on the issues on which they prevailed. Each party will bear its own costs on appeal.

## CONCLUSION

We affirm the district court's denial of the individual officers' motion for new trial. The verdict against them stands. Because erroneous admission of the newspaper quotations may have prejudiced the supervisory defendants' case, we reverse the denial of the new trial motion to these defendants and remand for a new trial in which the quotations are to be admitted only upon compliance with the Federal Rules of Evidence as delineated in this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.