**In re CYPRESS SEMICONDUCTOR SECURITIES LITIGATION.**

**This Document Relates To: All Actions.**

**No. C 92–20048 RPA (PVT).**

United States District Court,
N.D. California,
San Jose Division.

June 6, 1995.

Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, for plaintiff.

Terry T. Johnson, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

AGUILAR, District Judge.

This is a securities fraud class action on behalf of disgruntled investors who purchased Cypress Semiconductor Corporation's ("Cypress") stock between August 19, 1991 and April 14, 1992. The plaintiffs allege that Cypress and its officers and directors artificially inflated the price of Cypress' stock by issuing misleading public statements in violation of §§ 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Defendants Cypress, T.J. Rogers, Mark Allen, Ken Goldman, Marcel Gani, Thomas North and Lowell Turriff now move for summary judgment against all of plaintiffs' claims. The court has read the moving and responding papers and has heard the argument of counsel. For the reasons discussed below, defendants' motion is GRANTED.

### BACKGROUND

Cypress manufactures and sells semiconductor chips for use in computers and telecommunications. Cypress' Chief Executive Officer, T.J. Rodgers, founded the company in 1982 and took it public four years later. Cypress grew dramatically. Revenue in-

creased from $51 million in 1986 to $285 million in 1991.

Cypress, however, had a disappointing fourth quarter in 1991 and a disappointing first quarter in 1992. Revenue and earnings decreased in those quarters, falling short of Cypress' internal projections. After Cypress reported the disappointing results, its stock dropped, precipitating this lawsuit. Cypress is now a very successful company, generating $406 million in revenue in 1994.

Plaintiffs' allegations center on Cypress' revenue and earnings forecasts for the fourth quarter of 1991 and the first quarter of 1992. Cypress's beginning of quarter ("BOQ") forecast, issued in the first month of the quarter, projected revenue of $76.1 million and earnings per share of $0.21 for the fourth quarter of 1991. The actual revenue for the fourth quarter was $71 million, yielding earnings per share of $0.15. Cypress' stock price fell from $17¾ to $14⅛ on this news.

After getting the fourth quarter results, Rodgers ordered a review of the reasons Cypress had missed its forecast. The "Post Mortem" that followed did not reveal a single cause of the shortfall. The "Post Mortem" found that manufacturing errors in the San Jose test area were responsible for $756,000 in lost revenue. Marketing was responsible for $743,000 of lost revenue. Problems involving certain high-performance low-volume parts was responsible for $712,000.

Cypress' projections for the first quarter of 1992 were also off the mark. The first quarter BOQ forecast predicted revenue of $73 million and earnings per share of $0.16. Although first quarter revenues exceeded Cypress' predictions, earnings per share fell short of expectations, reaching only $0.10. The news lowered the stock price from $11 to $10⅞. Cypress attributed the low earnings per share to unexpected price erosion in the SRAM (Static Random Access Memories) chip market and to an increase in demand for low margin SRAMs.

Plaintiffs maintain that Cypress should not have been surprised by the disappointing numbers, that it should have known all along that the projections were unrealistic. According to the plaintiffs, Cypress' projections were fraudulent because Cypress knew of and failed to disclose adverse facts that undermined the foundation of the forecasts. Specifically, plaintiffs allege that Cypress was aware of softening demand for several major product lines, a market-wide decrease in SRAM prices, a fissure in Cypress' relationship with Sun Microsystems—one of Cypress' biggest customers—that was sure to have an negative effect on revenue and earnings during the class period. Plaintiffs also contend that Cypress concealed problems at the San Jose and Minnesota manufacturing plants.

In addition to hiding these adverse facts, plaintiffs assert that Cypress concealed problems with its forecasting system itself. Cypress allegedly knew before the class period that the system had become unreliable. Plaintiffs point out that Cypress' officers expressed frustration in internal memos with the company's BOQ forecast process.

Plaintiffs also claim that Cypress violated Rule 10b–5 by using "pull-ins"—i.e., encouraging buyers who had placed orders for future delivery to take delivery in the current quarter so that Cypress could show the revenue in that quarter. Cypress' failure to disclose the use of "pull-ins" rendered its revenue and earnings figures misleading, plaintiffs argue, because the figures actually reflect future sales.

Plaintiffs seek to hold Cypress liable for projections contained in newspaper articles and analysts' reports. Cypress allegedly disseminated its projections to the media and securities analysts, who in turn communicated the numbers to the public. Plaintiffs also rely on statements in shareholder letters and press releases concerning Cypress' prospects for the fourth and first quarters.

Cypress and the individual defendants seek summary judgment on all of the alleged misstatements. In so doing, the defendants object to some of plaintiffs' evidence submitted in opposition to the summary judgment motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material

fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears "the initial responsibility of informing the district court of the basis for its motion. . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To satisfy this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322, 106 S.Ct. at 2552. However, the moving party is not required to *negate* those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.* at 323, 106 S.Ct. at 2553.

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The adjudication of a summary judgment motion is not a "trial on affidavits." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Credibility determinations and weighing of the evidence are solely jury functions. *Id.* Inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

However, there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. And in some circumstances the factual context may render the nonmoving party's claim implausible, and the nonmoving party must

come forward with "more persuasive evidence" to support the claim "than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## ANALYSIS

Plaintiffs' claims are based on Section 10(b) of the Securities Exchange Act of 1934 and SEC's Rule 10b–5, a regulation issued under § 10(b). The elements of a Rule 10b–5 claim are (1) a false statement or an omission that rendered another statement misleading; (2) materiality; (3) scienter; (4) loss causation; and (5) damages. *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

Cypress maintains that it is entitled to summary judgment because the record shows that its projections for the fourth quarter of 1991 and the first quarter of 1992 did not lack a reasonable basis. According to Cypress, the projections proved inaccurate—and barely at that—not because Cypress ignored or failed to take into account adverse facts, but because of unexpected developments both within Cypress and in the semiconductor market in general. Cypress contends that it factored all of the problems highlighted by plaintiffs of which it was aware into its quarterly forecasts.

Plaintiffs have identified over thirty allegedly false and misleading statements. The court will address the statements and omissions within the following categories: (1) statements contained in newspaper and magazine articles; (2) statements contained in analysts' reports; (3) Cypress' statements made at conference calls and in press releases and annual reports.

### A. *Newspaper and Magazine Articles (Statements A, B, D, K, U)* [1]

Plaintiffs rely on statements made by Cypress' officers contained in a number of magazine and newspaper articles. The articles and reports quote Cypress' revenue and earnings projections and attribute certain op-

---

**1.** The statements are identified by letter as they appear in Plaintiffs' Amended Responses To Defendants First Set of Interrogatories To All Plaintiffs. The Court previously issued an order restricting plaintiffs to the statements identified in the amended interrogatory responses. *See Order Striking Plaintiffs Second Amended Interrogatory Responses,* April 19, 1995.

timistic statements to the company's executives. The articles include: an August 19, 1991 issue of *Baron's* which states that Cypress' revenues will exceed $300 million in 1991; a *Defense News* article which purportedly quotes Rodgers as saying that 1991 sales will be "approximately $300 million;" and an article appearing in the *Wall Street Journal* on January 21, 1992, claiming that Cypress predicts "some improvement" in earnings for the first quarter of 1992.[2] Cypress marches through a desultory exposition of the substantive insufficiencies of the statements. At the same time it also invites the court to take a shorter road to their demise by excluding them on hearsay grounds. If they are excluded, Cypress asserts, plaintiffs cannot sustain their burden of demonstrating that these misstatements were made in that the articles themselves are the only evidence of this fact. The Court will first discuss the admissibility of the articles.

### 1. *Evidentiary Objections*

■ The articles clearly fall within the definition of hearsay under Fed.R.Evid. 801(c). They are out of court statements offered to prove the truth of the matter asserted, i.e. that Rodgers made certain statements. *See Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir.1991) (holding that newspaper article offered to prove that defendant made statement quoted in article was hearsay). Consequently, the articles are inadmissible and cannot be considered at summary judgment unless they fall within a hearsay exception. *See In re Seagate II Sec. Litig.*, [1994–95 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,530 at 91,583–85 (N.D.Cal. Feb. 8, 1995) (newspaper articles not properly considered on motion for summary judgment in securities fraud case); *see also Burlington Coat Factory v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (inadmissible hearsay may not be considered on motion for summary judgment).

Plaintiffs rely on the "catch-all" exception to the hearsay rule set forth in Fed.R.Evid. 803(24), which allows out of court statements with "circumstantial guarantees of trustworthiness" to be admitted under certain circumstances. Most courts, however, have held that newspaper and magazine articles will rarely fit the bill. In *Larez*, for example, the Ninth Circuit rejected plaintiff's attempt to admit under Rule 803(24) a newspaper article containing statements ascribed to the defendant. Although recognizing that newspaper articles normally meet the trustworthiness requirement, the court concluded that articles are nonetheless inadmissible if the declarant, i.e., the journalist, is able to testify about the statements. In support of this conclusion, the court noted that Rule 803(24)(B) has a "best evidence" requirement. It requires that the hearsay evidence be more probative than any other evidence that could be reasonably obtained. In terms of statements in newspaper articles, the best evidence of the statements is not the article, but the testimony from the reporter who wrote the article. It follows that a showing of the reporter's unavailability is necessary before news reports are admissible to prove that the statements were made. *Larez*, 946 F.2d at 644.

Plaintiffs run afoul of the "best evidence" prerequisite articulated in *Larez* in that they neglected to offer the deposition testimony of the reporters who quoted Cypress' officers in the articles. Alternatively, they have not shown that the reporters' depositions could not be taken. Plaintiffs argue that they could not depose the journalists because the court only allowed twenty depositions per side. This explanation is inadequate. No one prevented plaintiffs from using some of their depositions in this area. Plaintiffs alone decided to ignore an important aspect of their case. Obviously, the existence of a statement has to be established before it can be proved fraudulent. Plaintiffs missed this basic step. They should have allotted some

2. The plaintiffs' reliance on an article written by Rodgers which appeared in the July/August 1990 issue of *Harvard Business Review* (statement A) requires little discussion. The statements in the article are not actionable because they were made more than a year before the class period began. *See In re Seagate Technology II Sec. Litig.*, [1994–1995 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,630, 91,563 (N.D.Cal.1995) ("In a securities class action lawsuit, liability cannot attach to statements made either before or after the class period.")

of their depositions to establishing that the statements were made in the first place. Because the plaintiffs could have obtained better evidence in the form of the reporters' testimony with reasonable efforts, the newspaper and magazine articles are inadmissible under Rule 803(24).

### 2. Defendants' Substantive Arguments

██ Even if the articles were admissible, the forecasts and optimistic proclamations they contain are not actionable under Rule 10b–5. In the Ninth Circuit, projections and general statements of optimism are not actionable unless: (1) the statement was not genuinely believed; (2) the statement did not have any reasonable basis; or (3) the speaker was aware of undisclosed facts tending to "seriously undermine the accuracy of the statement." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989). The proper focus is on the facts available at the time the prediction was made. Evidence that a prediction turned out to be wrong does not prove that the prediction was false when made. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir.1993).

### a. Baron's and Defense News Articles

██ Cypress' revenue projections allegedly reported in *Baron's* and *Defense News,* while ultimately proven wrong in hindsight, did not lack a reasonable basis. Rodgers' purported prediction in *Baron's* of $300 million in revenues for 1991 was entirely consistent with Cypress' internal projections, which called for 1991 revenues of $296 million.[3] At the time of the *Baron's* article, Cypress was ahead of this projection and on track to bring in revenues of $307 million in 1991. Similarly, when the *Defense News* article was published in December 1991, Cypress' revised internal forecast projected 1991 revenues of $292 million. This is "approximately" $300 million. Moreover, Rodgers had more than a

reasonable basis for relying on Cypress' projected numbers. The company's internal forecasting process had proven uncannily accurate in predicting quarterly revenue. From 1988 to the start of the class period, the overall accuracy of the BOQ forecasts averaged 99%.[4] *Cf. Kowal v. MCI Communications,* 16 F.3d 1271, 1277 (D.C.Cir.1994) ("A history of successful operations in many circumstances may provide management with a reasonable basis for predictions of similar prospects in the future.").

Plaintiffs do not challenge the historical accuracy of Cypress' forecasts. Rather, they contend that reliance on the forecasts was unreasonable because Cypress knew that its BOQ forecasting process had broken down as of the beginning of the class period. In support of this contention, plaintiffs point to several internal memos written by Cypress' officers. These memos discuss "fixing" and "improving" the BOQ forecasting process. To be sure, the memos identify problems with the forecasting system. But contrary to plaintiffs' assertions, the memos do not suggest that the BOQ process had suddenly broken down after successfully predicting performance for years. Read in their entirety, the memos show how difficult it is to prepare a forecast and reveal Cypress' efforts to improve and streamline an already successful system. The memos refer to past problems that had been solved. This indicates that the system was progressively improving on its historical successes, not getting worse. For instance, in one of the memos on which plaintiffs rely, treasurer Marcel Gani writes, "In the last few quarters, we have put some fixes in place ..." Moreover, the central preoccupation of the memos is with the time the it was taking to complete the forecasts rather than with the accuracy of the forecasts. Nothing in the memos suggest that the forecasting process had become

---

**3.** *Baron's* does not even attribute the statement to Rodgers. Rodgers cannot be held liable for a reporter's statement unless he adopted the article. There is no evidence that Rodgers adopted the *Baron's* article. See discussion of analysts' reports, *infra.*

**4.** Plaintiffs make much of Goldman's statement to the board of directors in December 1991 that

Cypress had "missed 7 out of 11 BOQ revenue." Contrary to plaintiffs' assertion, Goldman's statement does not show that the forecasting process was unreliable. The misses Goldman alluded to were not significant. In seven of the eleven quarters, Cypress' revenue fell short of projections by an average of 3%—an excellent record by anyone's standards.

unreliable. Cypress had no duty to disclose every problem, challenge and frustration its officers encountered in preparing the forecasts. "A company need not detail every corporate event, current and perspective ..." *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 516 (9th Cir.1991) (quoting *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 491 (9th Cir.1974)).

In addition to attacking the forecasting system, Plaintiffs contend that Cypress' management knew that it had no hope of meeting its forecast because of adverse market conditions and problems within Cypress. Plaintiffs rely again on internal memos to prove this point. In particular, plaintiffs harp on Rodgers' statement in a September 1991 internal memo that "It's hard to remember the last time I was so depressed about the company." Rodgers' next sentence, however, eliminates any inference that he did not have faith in the class period forecasts: "Not the near term future success—making the next quarter or two—but the long-term prospects for our company." Plaintiffs also take snippets of Rodgers book *No Excuses Management* (Doubleday, 1992) out of context. In the book, Rodgers notes that market conditions were difficult in 1991. But nothing in the book undercuts the validity of Cypress' 1991 fourth quarter forecast. In fact, the numbers he refers to in the book were consistent with the fourth quarter forecast. All in all, plaintiffs provide no evidence to support a verdict that Cypress' forecast lacked a reasonable basis. Summary judgment is therefore appropriate on all of the projections contained in the articles.

b. *Wall Street Journal Article*

■ . The prediction reported in the *Wall Street Journal* of "some improvement" in Cypress' earnings for 1992 is also not actionable. Numerous courts have held that vague statements predicting growth are not materially misleading because reasonable investors, knowing that corporate executives are almost always publicly sanguine about the prospects of their company, ignore them. *See In re Verifone Sec. Litig.*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company.") *aff'd* 11 F.3d 865 (9th Cir.1993); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (soft, puffing statements are not specific enough to be material); *In re Syntex Sec. Litig.*, 855 F.Supp. 1086, 1095 (N.D.Cal.1994). In *Raab*, the court held that statements such as "[defendant] is poised to carry the growth and success of 1991 well into the future," and "results should be in line with current analysts projections" were not actionable. 4 F.3d at 288, 289–290. Similarly, in *Syntex*, the court dismissed as non-actionable the defendant's statement that it expected "a very strong fiscal 1993." 855 F.Supp. at 1095. Cypress' prediction of "some improvement" in 1992 earnings is no less vague and indefinite and therefore lacks the requisite specificity to be material.

B. *Statements in Analysts' Reports (G, H, I, J, L, M, N, O, Q, T, V, W, X)*

Plaintiffs also rely on statements attributed to Cypress in various analysts' reports. The reports contain revenue and earnings projections for the fourth quarter of 1991 or the first quarter of 1992. Some of the reports purport to quote Cypress' officers, and some of them, without attributing quotes to anyone, indicate that certain information came from Cypress.[5] The analysts' reports, insofar as they are offered to show that Cypress' officers made the statements quoted in the reports, are inadmissible hearsay. *See Larez*, 946 F.2d at 643.

■ Cypress may nevertheless be held responsible for statements in the analysts' reports—even those which do not purport to be

---

5. These reports include: (1) a Goldman Sachs report dated 1/21/92; (2) a Merrill Lynch report dated 1/21/92; (3) Prudential Securities reports dated 10/25/91 and 1/28/92; (4) a PaineWebber report dated 1/21/92; (5) a Hambrecht & Quist report dated 1/20/92; (6) a T.R. Winston & Co. Report dated 5/26/92; (7) Robertson Stephens & Co. reports dated 10/31/91 and 1/22/92; (8) Kidder, Peabody & Co. reports dated 10/17/91; 11/11/91 and 1/22/92; (9) a *RTQuotes News Service* report dated 10/14/91; (10) a *BusinessWire* report dated 10/14/91, 1991; and (11) a Needham & Co. report dated 12/11/91.

direct quotes—if Cypress adopted or otherwise "sufficiently entangled itself with the analysts' forecasts to render those predictions attributable to it". *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir.1980). Although never considered by the Ninth Circuit, several judges in this District have embraced the entanglement doctrine. *See In re Seagate Technology II Sec. Litig.,* [1994–95 Tr. Binder], Fed.Sec.L.Rep. (CCH) ¶ 98,530, at 91,583 (N.D.Cal.1995) (Walker, J.); *Syntex,* 855 F.Supp. at 1096; *In re Caere Sec. Litig.,* 837 F.Supp. 1054, 1059 (N.D.Cal.1993) (Williams, J.); *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 603 (N.D.Cal.1991) (Peckham, J.). The theory of liability is "that a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections". *Elkind,* 635 F.2d at 163. "This may occur when officials of the company have, by their activity, made an *implied representation* that the information they have reviewed is true or at least *in accordance with the company's views.*" *Id.* (emphasis added).

In *Elkind,* the defendant corporation reviewed and corrected analysts' earnings forecasts before they were published. Nonetheless, the Second Circuit refused to impute the forecasts to the defendant because the defendant never directly commented on the accuracy of the forecasts or suggested that the forecasts were in line with its own internal projections. The company's failure to comment on the forecasts was not an implied representation that the forecasts were accurate because the defendant had a corporate policy of not commenting on forecasts. 635 F.2d at 163.[6] Similarly, in *Seagate II,* Judge Walker granted summary judgment on statements in analysts' reports because the plaintiffs failed to present evidence that the defendants departed from their no-comment policy regarding analysts' projections. ¶ 98,-530 at 91,583.

■ In addition to engaging in pre-publication entanglement activity, a corporation may ratify analysts' reports after they have been published. *See In re Rasterops Sec. Litig.,* [1994–1995 Transfer Binder] Fed.Sec. L.Rep (CCH) ¶ 98,467 (N.D.Cal.1994); *see also Syntex,* 855 F.Supp. at 1096 (defendant may entangle himself with report "prior to or *after*" its publication) (emphasis added). This occurs when a company conveys the suggestion that the analysts' forecasts are accurate or at least in accordance with its views. Distributing analysts' reports to potential investors may, depending on the circumstances, amount to an implied representation that the reports are accurate. *See Rasterops,* ¶ 98,467 at 91,195; *see also Stack v. Lobo,* 1995 WL 241448 (N.D.Cal. April 20, 1995) (Williams, J.). In such a case, in contrast to pre-publication entanglement, liability does not depend upon imputing the analysts' statements to the company. Rather, the corporation's implied representation that the analysts' forecasts are accurate is itself actionable. This is a subtle, yet important distinction between pre-publication adoption and post-publication ratification.

■ In an effort to show entanglement before publication, Plaintiffs point to Cypress' frequent contacts with securities analysts. Cypress regularly talked with and briefed analysts. Cypress provided analysts with product and pricing information and discussed its future manufacturing and marketing plans. Plaintiffs have adduced no evidence, however, showing that Cypress even reviewed analysts' reports before they were published, let alone represented that the reports conformed to its internal projections. Rodgers and Allen both testified that Cypress does not give its forecasts to analysts and has a policy of not commenting on analysts' forecasts. Plaintiffs have failed to present any credible evidence that Cypress ever deviated from this policy during the class period.

The only evidence of entanglement plaintiffs present is a declaration of expert witness Candice Preston. She opines that Cypress' officers had conversations with securi-

---

**6.** If a corporation does not have a standing policy of not commenting on analysts' projections, its silence may have a different implication. For instance, a corporation that tells analysts that it will let them know if there are any inaccuracies in proposed forecasts impliedly represents that the forecasts are accurate if it fails to inform the analysts of errors.

ties analysts during the class period in which the officers confirmed the accuracy of projections: "In my opinion, defendants confirmed analysts' expectations in response to their request for guidance." Defendants have moved to strike Preston's declaration—and with good reason. Preston cannot testify about what someone said to someone else in a conversation if she wasn't there. The factual basis for this kind of opinion is completely lacking. She might be able to opine on how the typical analyst would interpret a given statement made by a corporate executive, like an expert did in *In re Adobe Systems, Inc. Sec. Litig.*, 787 F.Supp. 912, 916 (N.D.Cal.1992), *aff'd* 5 F.3d 535 (9th Cir. 1993), but that is a far cry from giving an opinion about whether the executive made the statement in the first place. Preston's testimony is incompetent. The motion to strike her testimony on this subject is granted.

Further, evidence that Cypress tracked analysts forecasts after they were published is insufficient. Such evidence does not demonstrate that Cypress commented on the accuracy of the reports before they were published. *See Seagate II* ¶ 98,530 at 91,583 (tabulating analysts' forecasts after publication is not probative of adoption). Absent evidence that Cypress engaged in activity suggesting that the analysts' forecasts were accurate, plaintiffs cannot show that Cypress adopted the forecasts before publication.

■ The next question is whether Cypress ratified the analysts' reports after they were published. Plaintiffs point out that in February 1992, Cypress' CFO Goldman sent several analysts' reports to two shareholders who had requested investment information from the company. By sending the reports, Cypress may have impliedly endorsed the projections contained in them. The insurmountable problem for the plaintiffs, however, is the absence of evidence that news of Cypress' endorsement was made public. Plaintiffs rely on the fraud on the market theory to establish reliance, which requires that misleading statements enter the market and affect the stock price. 886 F.2d at 1114–1115; *VeriFone*, 784 F.Supp. at 1478–1479. Cypress sent the reports to only two share-holders. There was no mass mailing and no evidence that the marketplace was informed of Cypress' actions. As a result, Plaintiffs cannot show that Cypress' alleged endorsement of the allegedly misleading analysts reports defrauded the market. Summary judgment is appropriate on all of the statements contained in analysts' reports.

### C. *Cypress' Own Statements*

#### 1. *Statement To Sales Force (C)*

■ In August 1991, Cypress officer Tony Alvarez said that Cypress would have its 1 Meg SRAM available for customers in the third quarter of 1991. The rub for plaintiffs is that Alvarez made the statement to a group of Cypress sales persons. This was an internal private audience, not a public gathering. Since the information did not enter the market and affect the stock price, plaintiffs cannot establish reliance on this statement. *See Apple*, 886 F.2d at 1115.

#### 2. *Statements About Fourth Quarter Backlog (E,F,R)*

Plaintiffs challenge two statements relating to Cypress' backlog: (1) an October 14, 1991 press release stating that Cypress was entering the fourth quarter with a record order backlog; and (2) a statement during a January 20, 1992 conference call that 78% of its 1992 first quarter forecast was on the order backlog. Plaintiffs do not challenge the literal truth of these statements—it is undisputed that the fourth quarter backlog was a record and that 78% was an accurate figure. Instead, plaintiffs contend that the statements were misleading because the backlog included double bookings which did not represent real orders. Unfortunately for the Plaintiffs, however, there is no evidence in the record that the fourth quarter 1991 or the first quarter 1992 backlogs included any double bookings. The only evidence plaintiffs present is a memo stating that Cypress had found double bookings in June 1991, months before the beginning of the fourth quarter. The evidence indicates that Cypress eliminated the double bookings in that month. Without any evidence of double bookings made later than June 1991, plain-

tiffs cannot get to the jury on the backlog statements.

### 3. *Statements About Sun Microsystems (E,F)*

 In its October 1991 Press Release and Conference Call, and in a letter to shareholders in December 1991, Cypress stated that Sun's Galaxy product, which included modules made by Cypress' Ross subsidiary, was "a hit" and would contribute significantly to revenue in the fourth quarter 1991 and in 1992. Plaintiffs argue that this statement misled the market because Cypress failed to disclose that Galaxy would soon be rendered obsolete by a new generation of Sun products which would use Texas Instrument modules instead of Ross modules.

Plaintiffs' argument fails because there is no evidence that Cypress knew in October or December that Galaxy, which had just been introduced on September 30, might soon become obsolete. Nor is there evidence that Galaxy sales were declining at the time of the press release or when the letter was sent. In fact, Cypress beat its fourth quarter 1991 forecast of sales to Sun and met its first quarter 1992 forecast.

Further, the market knew of the risk of Sun's Galaxy product becoming obsolete. The market is presumed to know of the risk of product obsolescence in high-tech industries. *See Convergent Technologies,* 948 F.2d at 513. In *Convergent Technologies,* the Ninth Circuit held that the defendant had no duty to disclose the risk that its own product might become obsolete on the ground that the market is presumed to know of this risk. 948 F.2d at 513–514. If, as *Convergent Technologies* says, a company does not have a duty to disclose the risk of its own product's obsolescence, then Cypress certainly had no obligation to tell the market that another company—Sun—might trump its new product with an even newer product. In any event, Cypress does not need the benefit of the presumption that the market knows about obsolescence. The record demonstrates that specific information about Galaxy's obsolescence—and the threat it posed to Cypress' business—entered the market during the class period. A Kidder Peabody report issued October 18, 1991 stated that Sun's new computer "has not been committed to Cypress' Pinnacle, which is up against the Sun/Texas Instruments Viking." A Wertheim Schroder & Co. report dated February 12, 1992 stated that "Sun will be shifting much of its SPARC line to the SuperSPARC-based products produced by Texas Instruments." Because this information was made credibly available to the market, any failure on Cypress' part to disclose material information about its business with Sun would be excused. *Apple,* 886 F.2d at 1115. For these reasons, Cypress is entitled to summary judgment on all statements regarding SUN.

### 4. *Cypress' Statements Concerning Third Quarter Results (P)*

In the December 1991 letter, Rodgers also reviewed Cypress' performance in the third quarter:

> Our gross profit margin of 56.9% of revenues decreased one-half percentage point from the preceding quarter due to lower sales generated by the relatively high-margin Ross technology and Aspen Semiconductor business units. Our new Minnesota plant continues its excellent performance and already accounts for 6% of Cypress' revenues.... Higher yields in our Texas and Minnesota plant contributed to higher output.

This statement is not actionable. Rodgers gave an accurate factual account of Cypress' third quarter performance. Moreover, these statements of historic fact did not convey a misleading impression by implying similar success for the future. *See Convergent Technologies,* 948 F.2d at 513 (statements of past growth did not imply future growth at same rate).

### 5. *Cypress' Statements Regarding Execution (E,F)*

 In the press release and conference call, Rodgers also stated that "[o]ur fourth quarter results depend on our own execution." Plaintiffs do not contest the truth of this statement (it's hard to imagine this kind of statement ever being false on its face), but rather argue that it conveyed a misleading

impression because it failed to disclose execution problems in Cypress' test areas. Specifically, plaintiffs point to delays or bottlenecks at the "burn in" stage of Cypress' testing process. This cost Cypress $750,000 in revenue for the fourth quarter. However, while Cypress did encounter a delay at the "burn-in" stage, the evidence shows that the severity of the delay was unexpected. Cypress had frequently confronted such delays in the past but had always been able to work through them quickly. Cypress had no duty to disclose a problem that neither existed nor was foreseeable at the time it made the statement. *See, e.g., Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir.1992) ("[A] statement true when made does not become fraudulent because things unexpectedly go wrong.").

6. *Statements Regarding Testing In 1st Quarter 1992 (R,S)*

A Cypress press release on January 22, 1992 stated: "The test problem will shortly be addressed by changes in the way we manage tests in the company.... The test area will be reorganized this week." Plaintiffs maintain that this statement was misleading. The evidence proves otherwise: Cypress reorganized the test area and had no more problems with it for the rest of the quarter. Defendants are entitled to summary judgment on this statement.

7. *Cypress' Prediction of 1st Quarter 1992 Performance (S)*

█ Plaintiffs also rely on a prediction that Rodgers made during a conference call with analysts on January 20, 1992. Rodgers stated, "We expect to beat revenue of last quarter in this quarter but not by a lot. The market is sluggish, if not disastrous. We expect to go forward but not dazzling performance ... to be up in both shipments and earnings." Plaintiffs claim that two undisclosed facts seriously undermined the accuracy of this statement: (1) competition in the SRAM market would force Cypress to sell SRAMs at a discount; and (2) Cypress' "pull-ins" in the fourth quarter of 1991 increased the amount of new orders Cypress needed in the first quarter of 1992. (Pull-ins are exist-

ing orders shipped in the current quarter rather than in a later quarter as originally scheduled.)

Plaintiffs' argument that SRAM competition undermined Cypress' prediction of a revenue and earnings increase is unavailing. First, the evidence shows that Cypress factored the prospect of lower SRAM margins into its prediction of growth for the fourth quarter. The decrease turned out to be more precipitous than Cypress expected, but there is no evidence that Cypress should have anticipated such a severe drop when it made its first quarter prediction. Cypress did not have the benefit of 20–20 hindsight that Plaintiffs have now.

Second, Cypress did inform the market about aggressive pricing in the SRAM market. In the analyst teleconference, Rodgers warned analysts, "Pricing in the SRAM group is pressure-on in the 256K SRAMs ... and the 64K SRAM I would pick as the most pressured product." And, even if this disclosure was inadequate, a number of analyst reports and articles published in the first quarter explicitly warned of the risks of SRAM price competition. For instance, a Merrill Lynch report dated January 21, 1991, attributed Cypress' poor performance in the fourth quarter of 1991 in part to pricing pressures in the SRAM market. Similarly, Wertheim Schroder's report dated the same day observed: "Much effort is being made to address [Cypress'] SRAM costs, as it needs to be more responsive to competitive pricing." Given the availability of this information, no reasonable jury could find that the market was mislead by Cypress' alleged failure to adequately disclose the risk of SRAM price decreases. *See Kaplan v. Rose*, 49 F.3d 1363, 1368 (9th Cir.1994); *Apple*, 886 F.2d at 1115.

█ Plaintiffs' argument that Cypress' use of "pull-ins" undermined Rodgers' expression of optimism for the first quarter fares no better. The evidence shows that Cypress' forecast for the first quarter took into account revenues lost to the fourth quarter as a result of "pull ins." In other words, the first quarter forecast upon which Rodgers based his statement did not reflect shipments originally scheduled for the first quar-

ter that were shipped in the fourth quarter. Moreover, while they may be emblematic of American business' habitual tendency toward short-term views, "pull-ins" are not the nefariously manipulative scheme that plaintiffs make them out to be. "Pull-ins" do not result in the improper recognition of revenue under generally accepted accounting principles. They are actual sales which are treated no differently than any other sale, i.e., revenue is recognized upon shipment to the customer. This is not a case where a corporation overstated its revenues by, for example, reporting consignment transactions as sales. *See Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.1994). Cypress' use of "pull-ins" did not seriously undermine Rodgers' statement that he expected growth in the first quarter of 1992.

### 8. *Cypress' 1991 Annual Report (Y)*

 In its 1991 Annual Report, Cypress stated that it "expect[s] to improve productivity in 1992." In addition to the absence of evidence showing that this statement lacked a reasonable basis, the statement is too vague to be actionable. *See Raab*, 4 F.3d at 289.

### D. *Secondary Liability Claims*

Plaintiffs' Second Amended Complaint also alleges that defendants are liable for aiding and abetting and conspiracy. The Supreme Court in *Central Bank of Denver v. First Interstate Bank of Denver*, —— U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994), held that there is no aiding and abetting liability under Rule 10b–5. This court and other courts in this district have held that *Central Bank's* rationale precludes conspiracy liability as well. *Rasterops*, 98,-467 at 91,195; *Syntex*, 855 F.Supp. at 1097.

### CONCLUSION

The short of the matter is this: Cypress had two disappointing quarters in late 1991 and early 1992. As a result, its stock price dropped. Plaintiffs argue that Cypress should have known what was coming and should have disclosed it. But the evidence shows that the problems underlying Cypress' poor performance were unexpected and that Cypress did not know and had no reason to know that it would not make its forecasts. Plaintiffs' entire case is based on hindsight, forgetting that the securities laws do not adopt this perspective. As Frederic William Maitland put it, "it is very difficult to remember that events now in the past were once far in the future." All of Cypress forward-looking statements had a reasonable basis at the time they were made, which is the only time that matters as far as the securities laws are concerned. No reasonable jury could find that any of Cypress's statements were false or misleading. Given this conclusion, the Court need not reach the issues of scienter or the individual defendants' liability. Defendants' motion for summary judgment is GRANTED in its entirety. IT IS SO ORDERED.